J-A21031-25

2025 PA Super 230

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                      :           PENNSYLVANIA
                                                      :
            v.                                     :
                                                      :
                                                      :
CHARLES DAVID DOUGLAS, III          :
                                                      :
            Appellant                          :  No. 859 MDA 2024

Appeal from the Judgment of Sentence Entered April 30, 2024
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0000252-2023

BEFORE:   PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:                    **FILED: OCTOBER 7, 2025**

Appellant, Charles David Douglas, III, appeals from the judgment of

sentence entered in the Court of Common Pleas of Cumberland County on

April 30, 2024. After a careful review, we affirm.

The relevant facts and procedural history, thoroughly summarized by

the trial court, are as follows:

> On August 3, 2022, Pennsylvania State Police Trooper Yoon Jang
> was on routine patrol performing speed enforcement on Interstate
> 81 southbound in the area of Exit 44 in Dickinson Township,
> Cumberland County. The posted speed limit in that area is 55
> miles per hour, but it changes to 65 miles per hour at mile marker
> 43.7. Trooper Jang was using a Falcon handheld radar through his
> driver's side window to monitor the speed of vehicles traveling in
> that area.
>
> At approximately 7:44 p.m., Trooper Jang observed a
> vehicle traveling at a high rate of speed, which triggered the
> radar's doppler tone to "shriek." The device measured the vehicle's

---

* Former Justice specially assigned to the Superior Court.

speed at 76 miles per hour, 21 miles per hour above the posted speed limit. Trooper Jang testified that his view of the vehicle was not obstructed in any way, and that the vehicle was traveling in the left lane when he initially observed it, moving over to the right lane while he was operating the radar.

Trooper Jang turned on his overhead lights and pulled out onto Interstate 81 southbound at mile marker 44. He got behind the vehicle in the right lane of traffic. The vehicle moved into the left lane of traffic to pass a tractor-trailer, and then proceeded to move back into the right lane. The vehicle stopped for Trooper Jang's signal at mile marker 42.5 on the right shoulder.

Trooper Jang approached the driver's side of the vehicle and identified Defendant by his Georgia driver's license. Trooper Jang explained to Defendant the reason for the stop. While speaking with Defendant, Trooper Jang noticed the "very strong" odor of an air freshener and detected the faint odor of marijuana coming from the vehicle. When Trooper Jang questioned Defendant about the odor, Defendant stated that he had smoked marijuana earlier. Defendant denied having a medical marijuana card, but stated that there was marijuana in the vehicle. Trooper Jang then asked Defendant to perform Standard Field Sobriety Tests (SFSTs).

While performing the Horizontal Gaze Nystagmus (HGN) test, Trooper Jang noticed that Defendant had bloodshot eyes, which, he testified, through his training, knowledge, and experience he knows to be a sign of impairment from the use of marijuana. During the walk-and-turn test, Defendant was unable to maintain balance, stopped after the ninth step, made an improper turn, and missed heel-to-toe. On the one-leg-stand test Defendant used his arms for balance.

Trooper Jang then conducted Advanced Roadside Impairment Driving Enforcement (ARIDE) testing. During the lack of convergence test, Trooper Jang observed that Defendant's left eye did not converge, which, according to his training, knowledge, and experience, indicates that Defendant may be under the influence of drugs. He again observed Defendant's eyes to be bloodshot, and Defendant's tongue was white. On the Modified Romburg test, Trooper Jang observed that what Defendant estimated to be 30 seconds was actually 16 seconds, which in his training, knowledge, and experience, may be an indicator of someone who had imbibed drugs.

- 2 -

Trooper Jang then asked to search Defendant's vehicle, to which he consented. The search yielded two multi-colored packs of suspected marijuana, a metal grinder, and a tray. Trooper Jang seized the items, eventually logging them into the Evidence Property Record System.

Defendant was placed under arrest for driving under the influence of a controlled substance. He was transported to UPMC Carlisle when he was read the DL-26 chemical test warning. At that time Defendant consented to a draw of his blood. Blood was taken at 8:35 p.m., approximately 50 minutes after the stop of Defendant's vehicle. The blood was analyzed and revealed the presence of Delta-g-tetrahydrocannabinol (THC) and its active and inactive metabolites.

Defendant was charged with Driving Under the Influence of a Controlled Substance (any amount of a Schedule I controlled substance); Driving Under the Influence of a Controlled Substance (any amount of a metabolite of a controlled substance); Driving Under the Influence of a Controlled Substance (incapable of safe driving); Unlawful Possession of a Small Amount of Marijuana; Unlawful Possession of Drug Paraphernalia; and Exceeding Maximum Speed Limits. The Commonwealth later withdrew Count 4 - Unlawful Possession of Small Amount of Marijuana under 35 Pa.C.S. § 780-113(a)(31)(ii) and amended the Information to include Count 7 - Unlawful Possession of Small Amount of Marijuana under 35 Pa.C.S. § 780-113(a)(31)(i).

A non-jury trial commenced before [the trial court] on April 4, 2024. The Commonwealth first offered the testimony of Michael Lamb, who was permitted to testify as an expert in Forensic Toxicology. Mr. Lamb testified that he is a forensic toxicologist with NMS Labs, a laboratory located in Horsham, Pennsylvania. In this case, Mr. Lamb testified, NMS was asked to test a sample of blood received via Federal Express. He stated that they were asked to test the blood for the presence of Delta-9 THC, the active component of marijuana, as well as two of its primary metabolites. In this case, Delta-9 THC was detected at a concentration of 9.1 nanograms per milliliter. Additionally, the blood contained 11-Hydroxy Deita-9 THC, a substance created when Delta-9 THC is metabolized by the liver, also known as an active metabolite, at the level of 3.5 nanograms per milliliter. The blood also contained Delta-9 Carboxy THC, a substance created as the body further

- 3 -

metabolizes THC, also known as an inactive metabolite, at a level of 100 nanograms per milliliter. Mr. Lamb testified that the presence of 11-Hydroxy Delta-9 THC indicates recent use of marijuana, likely within 24 hours of the blood draw.

On cross-examination, defense counsel asked Mr. Lamb if his job was to "make sure if anything looks strange or if any of it looks off that you get it retested." Mr. Lamb replied that case review is part of his job, and that there are "many processes that we employ, kind of like checks and balances, to ensure that results are recorded appropriately." Defense counsel then inquired if there was anything that was "off originally." Mr. Lamb stated that it is not uncommon to "rerun" samples, and that in this particular case, they did retest a sample, and the results were confirmed "within precision of the original results" and reported. Mr. Lamb further testified that the repeat testing was only done for the THC level, and that the analyst who performed the testing reran the test because of an issue with the chromatography that was resolved when the test was rerun. The initial test measured the THC in the amount of 11 nanograms per milliliter, and the second test measured THC in the amount of 9.1 nanograms per milliliter, so the lower amount was reported. Mr. Lamb stated that all of the testing results would be reported in raw data, and that the raw data is not typically provided with a report but can be requested.

The Commonwealth then offered called Trooper Jang. Trooper Jang's testimony was supported by a Motor Vehicle Recording (MVR) which was submitted into evidence and played for the [c]ourt. The MVR reflects the information testified to by Trooper Jang, as recited *supra*.

The Commonwealth last offered the testimony of Taylor Yurasits, who was permitted to testify as an expert in the quantification of controlled substances in whole blood. Ms. Yurasits is a Forensic Laboratory Analyst with the Cumberland County Forensic Laboratory. In this case, Ms. Yurasits testified that she received the sample of Defendant's blood on August 5, 2022, performed testing on the blood on August 8, 2022, and prepared a report of her findings, which was reviewed by a certifying scientist.

Ms. Yurasits then testified to her findings. The first test that she performed was a 13-panel drug screen analysis, which was presumptively positive for cannabinoids. She then sent the blood

sample to NMS Labs for a confirmatory test and quantification. Ms. Yurasits stated that the Cumberland County Forensic Lab will typically do their own confirmatory and quantification testing, but at the time Defendant's sample was collected, the instrument that they use for confirmatory and quantification testing was being upgraded, so it was the practice at that time to send blood samples to NMS Labs for further testing.

After the close of evidence, defense counsel argued that there was no indication of impairment from Defendant's driving, noting that he was merely speeding, and the results of the field sobriety tests were "somewhat irrelevant." Defense counsel then argued that the blood results were inconclusive because Mr. Lamb could not point to the cause of the first invalid test, and that the results could have been "up to plus or minus up to 20 percent incorrect."

[The trial court] then found Defendant guilty of Count 1 - driving under the influence of a controlled substance (THC); Count 2 - driving under the influence of a controlled substance (metabolite); and Count 6 - exceeding maximum speed limit. [The trial court] acquitted Defendant of possession of a small amount of marijuana and possession of drug paraphernalia because the Commonwealth did not present any evidence to show that the substance seized was in fact marijuana. Likewise, [the court] acquitted Defendant on Count 3 - driving under the influence - controlled substance - impaired ability to safely drive. On April 30, 2024, Defendant was sentenced to a mandatory 72 hours to 6 months incarceration on the DUI offenses.

Tr. Ct. Op. at 1-8 (footnotes omitted).

Appellant filed a timely post-sentence motion on May 9, 2024. Following argument on the motion, the trial court denied the motion on June 7, 2024. Appellant filed a notice of appeal and filed a concise statement pursuant to Pa.R.A.P. 1925(b) on July 11, 2024. The trial court filed its 1925(a) opinion on November 8, 2024. This appeal followed.

Appellant raises the following three issues for our review in his brief:

I. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AS TO SHOCK ONE'S SENSE OF JUSTICE WHERE THE TESTIMONY AND OTHER EVIDENCE ESTABLISHED MR. DOUGLAS WAS NOT GUILTY OF DUI CONTROLLED SUBSTANCE IMPAIRS ABILITY TO SAFELY DRIVE AND THE LAB TESTING CONTAINED INCONSISTENCES?

II. WHETHER THE FAILURE OF THE COMMONWEALTH TO PROVIDE MR. DOUGLAS WITH THE COMPLETE LAB REPORT INCLUDING THE TESTING DATA WHICH WAS FLAGGED AS INCONSISTENT VIOLATED MR. DOUGLAS' DUE PROCESS RIGHTS AS THE EVIDENCE IS POTENTIALLY EXCULPATORY UNDER, BRADY V. MARYLAND, 373 U.S. 83 (1963)?

III. WHETHER THE TESTIMONY OF COMMONWEALTH'S WITNESS MICHAEL E. LAMB VIOLATED MR. DOUGLAS' RIGHTS UNDER THE CONFRONTATION CLAUSE, SMITH V. ARIZONA, WESTLAW NO. 22-899 (S. CT. DECIDED JUNE 21, 2024), AS MR. LAMB'S TESTIMONY AND LAB REPORT WERE BASED ON ANOTHER LAB ANALYST'S TESTING AND TESTIMONIAL NOTES RELATED TO THAT TESTING?

Appellant's Br. at 6.

Appellant's first issue is a challenge to the weight of the evidence. "[A] trial court's denial of a post-sentence motion based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Sanders***, 42 A.3d 325, 331 (Pa. Super. 2012) (internal quotation marks omitted). In connection with a weight-of-the-evidence issue, we engage in exceedingly narrow review. To begin, we recognize that,

> our standard of review for a weight-of-the-evidence claim is an abuse of discretion. As we have often reminded appellants, "An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." ***Commonwealth v. Windslowe***, 158 A.3d 698, 712 (Pa. Super. 2017). . . .

- 6 -

"An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Santos*, 176 A.3d 877, 882 (Pa. Super. 2017). To mount an abuse-of-discretion attack against the trial court's determination that its guilty verdicts were not so against the weight of the evidence as to shock that court's own conscience, [an appellant must] . . . demonstrate how the trial court's ruling overrode the law, was manifestly unreasonable, or the product of bias, prejudice, ill-will or partiality.

*Commonwealth v. Rogers*, 259 A.3d 539, 541 (Pa. Super. 2021), appeal denied, 280 A.3d 866 (Pa. 2022) (emphasis omitted). A weight-of-the-evidence claim "concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. 2006). "The finder of fact . . . exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence." *Commonwealth v. Sanchez*, 36 A.3d 24, 39 (Pa. 2011).

Appellant argues that the verdict was against the weight of the evidence and that the trial court abused its discretion in finding him guilty of 75 Pa.C.S.A. §§ 3802(d)(1)(i) and (iii). Appellant's Br. at 16. The relevant DUI statute provides:

(d) Controlled substances. — An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:

(1)    There is in the individual's blood any amount of a:

(i) Schedule I controlled substance, as defined in the act of April 14, 1972 (P.L.233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act;

. . .

(iii) metabolite of a substance under subparagraph (i) or (ii).

(2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(d).

Appellant takes issue with the three reasons relied on by the trial court for its verdict: First, the trial court reasoned that Appellant's blood tests showed THC and its active and inactive metabolites, yet Appellant argues that there was an issue with the testing. Appellant's Br. at 17-18. Second, the trial court relied on Appellant's poor performance on the SFSTs and ARIDE testing, yet it acquitted Appellant of 75 Pa.C.S.A. § 3802(d)(2), finding insufficient evidence that Appellant's ability to safely drive was impaired. Appellant's Br. at 19. Third, the trial court relied on Appellant's admission to Trooper Jang that he admitted to smoking marijuana and was in possession of it, yet the statute required proof that the substance was in his blood; an element that cannot be satisfied by mere admission to use or possession. Appellant's Br. at 21.

Appellant correctly indicates that section 3802(d)(1) does not require that a driver be impaired; it requires proof only that Appellant's blood contained an enumerated controlled substance or a metabolite of the

controlled substance. Appellant's Br. At 21; *see **Commonwealth v. Etchison***, 916 A.2d 1169, 1174 (Pa. Super. 2007) (emphasis omitted). While the trial court's 1925(a) opinion mentions the indicators of impairment in the SFSTs and the ARIDE testing, the odor of marijuana in Appellant's car, and his admission to marijuana use, Tr. Ct. Op. at 17, these are all factors that provided reasonable grounds to the Trooper that Appellant had marijuana in his system. These factors justified the Trooper's request for a blood draw, regardless of what weight the trial court afforded to this evidence for purposes of section 3802(d)(2). Significantly, the fact that Appellant's blood contained marijuana and its active and inactive metabolites is determinate.

The record supports the fact that Appellant's blood contained "*any* amount of specifically enumerated controlled substances in his blood, regardless of impairment." ***Etchison***, 916 A.2d at 1174 (emphasis in original). Appellant argues that the results were unreliable because on cross-examination, he elicited testimony from Mr. Lamb that "the analyst who was calculating the data reran the testing due to an issue with the chromatography." Appellant's Br. at 17; N.T., 4/22/24, at 21. The first test resulted in 11 nanograms of THC per milliliter of Appellant's blood. The second test resulted in 9.1 nanograms per milliliter. N.T., 4/22/24, at 16, 24.

Despite Mr. Lamb's testimony that there was an issue with the chromatography, the issue, which could have had several causes, was resolved when the test was rerun. N.T., 4/22/24, at 21-22. Mr. Lamb reported the lower

of the two numbers in his conclusion. Cmwlth. Ex. 10. The trial court credited the expert's opinion that this is not an uncommon issue and that samples are routinely rerun yet still reliable. Tr. Ct. Op. at 11. We are bound by the trial court's credibility findings. Accordingly, we find no abuse of discretion by the trial court.

Appellant's second issue is that the Commonwealth violated his due process rights by running afoul of **Brady v. Maryland**, 373 U.S. 83 (1963), when it failed to provide lab reports and results that revealed issues with the testing of his blood sample. To establish a **Brady** violation, an appellant "must demonstrate: (1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced." **Commonwealth v. Treiber**, 121 A.3d 435, 460-61 (Pa. 2015). No Brady violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence. **Commonwealth v. Morris**, 822 A.2d 684, 696 (Pa. 2003).

Appellant argues that the Commonwealth provided him with the three-page lab report documenting the testing performed at NMS Labs. However, the expert witness testified that he reviewed data not listed within the three-page report in order to render his testimony. Appellant's Br. at 25. Appellant argues that the undisclosed reports could have proved his innocence given that errors occurred during testing. **Id**.

Pennsylvania Rule of Criminal Procedure 573 requires the Commonwealth to turn over the results of expert opinions in its possession or control. Specifically, Pa.R.Crim.P. 573(B)(1)(e) reads:

(1) Mandatory. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
. . . .
(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth[.]

Pa.R.Crim.P. 573(B)(1)(e). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 853 (Pa. 2005) (quoting *Brady*, 373 U.S. at 87). Additionally, Pa.R.Crim.P. 573(D) provides that both parties have a continuing duty to disclose evidence that is requested prior to trial that is subject to disclosure.

In the instant case, Appellant requested discovery, including any expert information and reports. The Commonwealth provided discovery materials that included the complete report it received from NMS Labs. However, Appellant did not receive the raw data upon which the lab report was based. The Commonwealth asserts that it was never in possession of the raw data;

- 11 -

indeed, Mr. Lamb testified that it is not lab policy to include the raw testing data in the report, although it may be requested from the lab.

The Commonwealth did not request the raw data from the lab, and Appellant did not request the raw data from the Commonwealth or from the lab. NMS Labs, Inc. is an independent laboratory and not a government agency, Tr. Ct. Op., at 12, so it cannot be arguably considered "the state" or "the police" for purposes of **Brady**. NMS Labs accepts samples from various agencies, medical examiners, police departments, doctors, and defense attorneys. N.T., 4/22/24, at 11. Appellant was entitled to file a motion compelling the Commonwealth to obtain and release the raw testing data pursuant to Pa.R.Crim.P. 573(B)(1)(e), but he did not. He states in his brief that if he was given this data, he could have employed his own expert to examine and interpret the data. Appellant's Br. at 26. However, he had the right to subpoena NMS labs directly, but he did not do so. Accordingly, because Appellant failed to act with due diligence to uncover this data to which he had equal access, no **Brady** violation occurred.

To be sure, we also note that Appellant did not establish that the raw data contained exculpatory material, nor does he submit that it contained information contrary to the result that Appellant's blood contained THC. He does not assert that the raw data could have led to the conclusion that there was no concentration of THC in his blood, rather, he asserts that he could have had an expert examine any inconsistencies which he describes as "potentially

exculpatory." This falls short of the requirements to prove a **Brady** violation. This claim fails.

Appellant's final issue is that Mr. Lamb's testimony violated the confrontation clause because he was not the analyst who performed the test on Appellant's blood sample. Appellant contends that admitting the lab report without permitting him to cross-examine the analyst who performed the testing violated his right to confront the witnesses against him under the Sixth Amendment of the United States Constitution, Article 1, Section 9 of the Pennsylvania Constitution, and **Smith v. Arizona**, 602 U.S. 779 (2024). Initially, we note that Appellant did not object at trial to the introduction of Mr. Lamb's lab report or his testimony, and thus any hearsay argument is waived on appeal. However, we elect to analyze the report to illustrate the conclusion that the Confrontation Clause is not implicated in light of the **Smith** decision from the United States Supreme Court.

"The issue of whether a defendant was denied his right to confront a witness under the Confrontation Clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Milburn**, 72 A.3d 617, 618 (Pa. Super. 2013) (citation and internal quotation marks omitted). Additionally, the United States Supreme Court has explained that

> [t]he Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. The Clause bars the admission at trial of "testimonial statements" of an absent witness unless she is "unavailable to testify, and the

> defendant ha[s] had a prior opportunity" to cross-examine her. ***Crawford v. Washington***, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). And that prohibition applies in full to forensic evidence. So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing. ***See Melendez-Diaz v. Massachusetts***, 557 U.S. 305, 307, 329, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

***Smith v. Arizona***, 602 U.S. 779, 783 (2024).

The Pennsylvania Supreme Court has opined that a toxicology report obtained by police in determining whether a suspect was DUI is testimonial and subject to the Confrontation Clause when "the report was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial and was plainly created for an evidentiary purpose." ***Commonwealth v. Yohe***, 79 A.3d 520, 537 (Pa. 2013) (citations and internal quotation marks omitted). The ***Yohe*** Court determined which analyst must testify in order to satisfy a defendant's right to confront the witnesses against him.

> In ***Yohe***, after police stopped Yohe for inoperable license plate and brake lights, the officer observed signs of intoxication. ***See id.*** at 523. The officer requested and obtained a blood sample and sent that sample to NMS Labs for analysis. ***See id***. At NMS Labs, an employee confirmed the seal was not broken, labeled the sample, and placed it in a secured bin. ***See id***. Another employee then retrieved the sample, removed a portion of blood (called an aliquot), returned the sample to storage, and tested the aliquot for alcohol content. ***See id***. This first test was completed using enzymatic assay. ***See id***. A third employee conducted two more tests with the sample by removing two new aliquots from the sample and testing those aliquots using gas chromatography. ***See id***. Finally, a fourth employee, Dr. Lee Blum, received all data from the three prior employees, examined the results of the three tests, confirmed the chain of custody, and authored a report indicating

what Yohe's BAC was at the time the blood sample was drawn. **See id.** at 523-24. Despite Yohe's objections, Dr. Blum's report was the report utilized at trial to convict Yohe. **See id.** at 524.25.

After reviewing in detail the U.S. Supreme Court decisions in **Melendez-Diaz v. Massachusetts**, 557 U.S. 305 (2009), **Bullcoming v. New Mexico**, 564 U.S. 647 (2011), and **Williams v. Illinois**, 567 U.S. 50 (2012), our Supreme Court parsed out who of the four employees were required to testify to satisfy the Confrontation Clause. The **Yohe** Court found that Dr. Blum was the analyst that must testify to satisfy the Confrontation Clause[.]

**Commonwealth v. Jackson**, No. 1788 MDA 2024, 2025 Pa. Super. Unpub. LEXIS 2399, at *8-9 (Sep. 12, 2025).[1] The Court reasoned that Dr. Blum was the analyst who legitimately determined the appellant's BAC because:

According to Dr. Blum's trial testimony, he reviewed the case folder, verified the chain of custody information and examined the personal identification information. Additionally, he checked the testing that was performed and the data that resulted, evaluated the analytical data from the duplicate gas chromatography and the enzymatic assay, compared the results of the two gas chromatography tests, compared the result of the enzymatic assay test to the two gas chromatography tests, ensured that these numbers supported each other, and reported the lowest of the two gas chromatography test results as Appellant's BAC.

**Yohe**, 79 A.3d at 539-40.

Nearly the same facts are present in the instant case: Mr. Lamb testified that after another analyst tested Appellant's blood sample, Mr. Lamb ensured compliance with chain of custody procedures, reviewed the underlying raw

---

[1] We note that, pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. We find guidance in the unpublished memorandum cited **supra** and find it to be instructive in this matter.

- 15 -

data, checked for any errors, compared the results of the original testing with the results of the re-test, determined that the numbers were "within precision" under certain criteria which he specified, and made an independent conclusion to report the lower of the two numbers based on the data. N.T., 4/22/24, at 12, 18-24.

Recently, the United States Supreme Court decided a case involving an expert analyst who provided testimony based on reports and notes prepared by another lab analyst who was absent from trial. *See Smith, supra*. Our research has revealed only two Pennsylvania cases addressing this decision. In *Smith*, the Court addressed the application of Confrontation Clause "principles to a case in which an expert witness restate[d] an absent lab analyst's factual assertions to support his own opinion testimony." *Smith v. Arizona*, 602 U.S. 779, 783 (2024). Appellant relies heavily on *Smith* to support his argument that Mr. Lamb's testimony regarding the toxicology report violated his Confrontation Clause rights. There the Court stated:

> To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") and it must be testimonial—and those two issues are separate from each other. The latter, this Court has stated, focuses on the "primary purpose" of the statement, and in particular on how it relates to a future criminal proceeding. A court must therefore identify the out-of-court statement introduced, and must determine, given all the "relevant circumstances," the principal reason it was made.

*Id.* at 800-01 (internal citation omitted).

Hearsay is an "out-of-court statement[] offered to prove the truth of the matter asserted." *Id.* at 785. Here, the declarant, Mr. Lamb, authored and

signed the lab report on which he based his opinions. Under **Yohe**, Mr. Lamb was the proper analyst to testify to the results of the toxicology report, and his report was not an out-of-court statement. Contrarily, in **Smith**, one analyst conducted the lab tests on the appellant's blood, documented her notes, typed the lab report, arrived at a conclusion, and signed the document. That analyst was no longer employed at the lab at the time of the appellant's trial, so the prosecution removed her name from the witness list and added a substitute analyst from the same lab who had no prior connection to the case. The substitute expert testified to the first analyst's conclusion using her report. **Id.** at 790. These cases are factually distinguishable as the report used there was hearsay and the report used here was not hearsay. Accordingly, Appellant's reliance on **Smith** is misplaced. We affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/07/2025